Wesley, J.
(dissenting). Because the record in this case supports the findings of Supreme Court and the Appellate Division that the People did exercise due diligence in attempting to procure the live testimony of Oscar Leal, we respectfully dissent.
We agree with the majority that “[d]ue diligence requires that when the People try to secure a witness’s presence at trial, they communicate in language the witness can understand” (majority opn, at 115). However, we disagree with the majority’s conclusion that the only acceptable proof of Leal’s ability to understand English was the use of an interpreter during Leal’s testimony at the first three trials. Based on this conclusion, the majority determines that, as a matter of law, the People did not exercise due diligence. Essential to such a *118 determination is that Leal can speak and understand only Spanish — a finding not made by either Supreme Court or the Appellate Division.
To our minds, there is ample evidence to support a finding that Leal was able to speak and understand English at a level necessary to comprehend the telephone calls from the New York officials. Assistant District Attorney Guido and Detective McCormack both described conversations they had with Leal during the third trial that indicate some proficiency in English.[1] In addition, the People offered testimony describing the details of telephone conversations Leal had with Detective McCormack and Assistant District Attorney Rothstein that indicate *119 that Leal had an understanding of English.[2] Detective McCormack stated that “[h]is English is, you know, with an accent, but [it] is pretty decent” and that “[h]is English was pretty good” and “understandable.” Assistant District Attorney Rothstein testified that “I guess I would agree with what Detective McCormack said. He described it as ‘understandable.’ ” Rothstein continued, “I could understand him for the limited purposes of this discussion.”
Since there was testimony as to Leal’s ability to understand English, there is ample evidence in the record to support the findings of Supreme Court and the Appellate Division. In People v Budd (46 NY2d 930, 931), we held that due diligence is *120 normally a mixed question of law and fact precluding this Court’s review if there is any evidence in the record to support it. Thus, the determinations below are beyond our review powers.
Moreover, it is not “obvious” that Leal was deficient in English just because he was provided a Spanish interpreter at trial. Because of the need for clarity in a witness’s testimony and the potential for confusion while being cross-examined in another language, trial counsel might well choose to allow his or her witness to testify in the language in which they are most proficient. The use of an interpreter at trial does not automatically imply that a witness is unable to speak or understand English. The majority would mandate the use of an interpreter when assessing the ability of a witness to understand post-trial communications such as those under review here.
Due diligence does require that the People communicate with a witness in language the witness can understand. It is the witness’s level of comprehension of that language that counts. There is ample evidence to show Leal clearly understood the People’s attempts to persuade him to return to New York. That conclusion, made by Supreme Court and the Appellate Division, is a mixed question of law and fact. We do not have the authority to overturn it no matter how convinced the majority may be that there was a better way to handle the situation.
Accordingly, we would affirm the order of the Appellate Division.
Chief Judge Kaye and Judges Smith and Ciparick concur with Judge Rosenblatt; Judge Wesley dissents and votes to affirm in a separate opinion in which Judges Levine and Graffeo concur.
Order reversed, etc.

. “A * * * He was downstairs. I had him sit in my cubical and I believe I went out and got him a soda and something to eat and I gave him a couple of magazines to read while he was sitting there that were on my desk, and I had a conversation with him.
“Basically, we started talking about SCUBA diving, that I had been SCUBA diving in Mexico, and we started talking about Mexico and he said that he wanted to go back to Mexico; that his family — his mother had a farm there. That she owned a small bit of land and that his family made money by planting vegetables, and that he was here in the United States working as a waiter/cashier to make money so that he could buy or rent more land so that they could grow more vegetables in Mexico.” (Guido testimony, Dec. 24, 1996 hearing transcript, defendant’s appendix, at 10.)
“Q Do you know, as you sit here now from information you possessed, whether or not he was legally in this country? * * *
“A Only, based on personal conversations. I don’t know for a fact.
“the court: Personal conversations with whom?
“the witness: Mr. Leal.
“the court: What did he tell you?
“the witness: He told me he was here — I believe he didn’t have any documentation. He was just here to work.
“by mr. silberblatt:
“Q For seven years; correct. * * *
“A That’s correct.” (Id., at 20.)
“Q Detective, how many times did you speak personally to Oscar Leal?
“A Back in August we had a lengthy conversation. That would be August 14th.
“Q Did it seem to you on August 14th, that Mr. Leal was reluctant to come to court?
“A Well, he was concerned, he was missing a lot of time from work. So he wasn’t very happy coming to court because of that.
“Q Did he say anything to you which indicated his unhappiness in coming to court?
“A Just in reference to his employment.
“Q He told you he was missing time on his job?
“A Right. For the days he was coming to court, he wasn’t getting paid and he was upset about that.” (McCormack testimony, at 35-36.)

. “A I called and I got a male on the phone and I asked if this was Oscar Leal and he said, ‘Yes, it was.’ I identified myself as being Detective McCormack from the D.A.’s Office.
“Q After you identified yourself, what is the next thing he said to you?
“A Well, he stated he wasn’t coming back to court and I can keep his watch.
“the court: He said what?
“He is not coming back—
“the witness: He is not coming back to court, to get his watch. I could keep his watch” {id., at 31).
“Q And what, if anything, did he tell you after that? Or tell us about the conversation.
“A Then I asked, ‘Well, that wasn’t my purpose. I wasn’t here to bring back property to you. Apparently, the case is continuing and we need you to appear in court again.’
“At that time I said he had to appear in court and I asked if he was coining to the United States in the near future and he said, ‘No,’ and at that point I said that we would provide (sic) any legal problems he would have or transportation, we would arrange that for him to come to the United States and at that point he said he had no desire to come back to America, he was just here temporarily to make money, because the family has a business in Mexico and he had no intention of returning” {id., at 32).
“A * * * I spoke to a person who identified himself as Mr. Leal and I indicated that I was now the Prosecutor on the case and would like him to return to New York to testify at the next trial.
“He indicated to me that he had returned to Mexico and was working on — I forget. I might have said his mother’s or his aunt’s, someone’s farm, and he didn’t want to return nor could he return, because of his immigration situation.
“I offered to have my office pay for his airfare and hotel expenses in New York. I also offered to arrange with Immigration to allow him into the country for the limited purpose for testifying here, and he indicated that he had no intention or desire to return here, even if I took those steps.
“I also asked him when he had left New York for Mexico, and he indicated — I don’t remember the exact date. He said either August 14th or 15th or August 15th or 16th, but it was clear to me that it was a day or two after his testimony in the third trial.” (Rothstein testimony, at 50-51.)